Filed 9/20/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SAN BRUNO COMMITTEE FOR ECONOMIC JUSTICE et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF SAN BRUNO et al., <br><br>     Defendants and Respondents; <br><br> SAN BRUNO HOTELS, LLC et al. <br><br>     Real Parties in Interest. | A149409 <br><br> (San Mateo County <br> Super. Ct. No. CIV538861) |

Plaintiffs San Bruno Committee for Economic Justice, Unite Here Local 2, Mary Dowden, Leif Paulsen, Sheral Marshall, Beatriz Johnston, Kathleen Semenza, Lilibeth Bonifacio, and Molly Gomez appeal from the order and judgment of the trial court denying their petition for peremptory writ of mandate. Plaintiffs had unsuccessfully sought to place a referendum on the ballot concerning a resolution passed by the City of San Bruno (City). The resolution approved the sale of real property to a hotel developer, defendant San Bruno Hotels, LLC. The trial court held, among other things, that the subject resolution constituted an administrative act and was therefore not subject to referendum. We agree and we affirm.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The basic facts in this case are not in dispute.

In 2001, the City Council certified an environmental impact report approving the U.S. Navy Site and Its Environs Specific Plan[1] (Specific Plan). The Specific Plan called for development of a seven-story, 500-room full-service hotel, with up to 15,000 square feet of meeting and retail space on what was, at that time, a five-and-one-half-acre site. The site is on a former U.S. Naval facility and is presently referred to as "The Crossings."

Over time, other projects have been developed on the property, reducing the size of the prospective hotel site to one and one-half acres. As a result, the potential hotel has been scaled down to approximately five stories with 152 rooms and underground parking, along with 3,000 square feet of meeting space.

On August 15, 2012, the City closed escrow on the one-and-one-half-acre hotel site, which it purchased for $1.4 million.

On October 12, 2012, the City issued a request for proposals (RFP) to design, finance, and build the prospective hotel.

On February 26, 2013, the city council selected OTO Development, LLC (OTO) for the hotel project, and authorized the city manager to enter into an exclusive negotiating rights agreement (ENRA). At that time, OTO suggested that it would need a subsidy from the City of approximately $3.9 million to develop the hotel. While the negotiations were ongoing, the City engaged in a public process to further amend the Specific Plan to make it consistent with the reduced parcel size and smaller potential hotel development.

On August 18, 2015, the City's planning commission held a public hearing on a proposed Specific Plan amendment and a supplemental environmental impact report (SEIR), voting to recommended them both to the city council for approval.

---

[1] Government Code section 65450 provides: "After the legislative body has adopted a general plan, the planning agency may, or if so directed by the legislative body, shall, prepare specific plans for the systematic implementation of the general plan for all or part of the area covered by the general plan."

On August 20, 2013, the City and OTO entered into an ENRA.

On September 8, 2015, the city council approved the Specific Plan amendment and the SEIR following another public hearing.

On March 15, 2016, the planning commission adopted a resolution finding that the sale of the subject property for hotel use would be consistent with the City's general plan. A purchase and sale agreement (PSA) was prepared.

On March 29, 2016, the city council adopted Resolution No. 2016-26, entitled, "Resolution Authorizing the City Manager to Execute a Purchase and Sale Agreement for Sale of the Crossing Hotel Property, and Authorizing the City Manager and City Attorney to Execute All Documents Necessary to Close Escrow." The resolution states that the agreed sale price was $3.97 million, with no subsidy or public funds payable to OTO. Shortly thereafter, plaintiffs began circulating a referendum petition to have Resolution No. 2016-26 put before a vote of City residents.

On April 18, 2016, the City and OTO (by San Bruno Hotels, LLC) entered into a PSA for the hotel site.

On April 27, 2016, plaintiffs filed with the City's clerk, Carol Bonner, approximately 3,250 signatures in support of their referendum petition challenging Resolution No. 2016-26.[2]

On May 17, 2016, Bonner emailed a community organizer for Unite Here Local 2, stating that, on advice of the city attorney, "the City will not be taking further action on the referendum petition." An attached letter from the city attorney explained that Resolution No. 2016-26 is not subject to a referendum petition because it is not a "legislative" act.

On May 23, 2016, counsel for plaintiffs sent a letter to Bonner and the city attorney challenging the conclusion that Resolution 2016-26 is not a legislative act

---

[2] The number of signatures exceeded the minimum required to qualify for placement on the ballot.

subject to referendum, and urging reconsideration of the refusal to process the referendum petition.

On May 27, 2016, plaintiffs filed a verified petition for peremptory writ of mandate, seeking to compel Bonner to certify the referendum petition.

On June 17, 2016, the City filed its answer to the petition. Among its affirmative defenses, the City alleged that plaintiffs had failed to exhaust their administrative remedies by filing a written notice of appeal under San Bruno Municipal Code Chapter 1.32, entitled, "Appeals to Council" (Chapter 1.32).

On June 24, 2016, plaintiffs filed a memorandum of points and authorities in support of their petition. They framed their action as follows: "This case is about whether City of San Bruno residents have the right to vote on the decision to sell city-owned land to a private hotel developer."

On July 6, 2016, plaintiffs filed a first amended verified petition for peremptory writ of mandate.

On July 11, 2016, OTO filed its answer to plaintiffs' amended petition.

On July 28, 2016, a hearing was held on the amended petition. After arguments by counsel, the trial court took the matter under submission.

On August 26, 2016, the trial court filed its order denying the motion for peremptory writ of mandate. The court first found that plaintiffs had failed to exhaust their administrative remedies because they did not pursue an appeal under Chapter 1.32. On the merits, the court found the city council's approval of the PSA was not a legislative act because the PSA was not tantamount to a development agreement. The court also concluded the PSA was generated in the course of implementing prior legislative decisions regarding the development of the subject property, rendering Resolution No. 2016-26 an administrative act, not a legislative act.

On September 28, 2016, the trial court filed its judgment.

4

# DISCUSSION

## I. *Standard of Review*

" 'On appeal following a trial court's decision on a petition for a writ of mandate, the reviewing court " 'need only review the record to determine whether the trial court's findings are supported by substantial evidence.' " [Citation.] However, we review questions of law independently. [Citation.] Where, as here, the facts are undisputed and the issue involves statutory interpretation, we exercise our independent judgment and review the matter de novo. [Citation.]' [Citations.] [¶] The trial court's determination that [the City's] actions did not violate the Elections Code is a legal finding subject to independent review. 'We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale.' " (*Lindelli v. Town of San Anselmo* (2003) 111 Cal.App.4th 1099, 1104 (*Lindelli*).)

## II. *The Subject Resolution Was an Administrative Act*

### A. *General Principles*

The power of referendum is conferred by article II, section 9, of the California Constitution. Courts have long observed that "[t]he power of referendum applies only to acts that are legislative in character; executive or administrative acts are not within the scope of that remedy." (*Housing Authority v. Superior Court* (1950) 35 Cal.2d 550, 557; see *Yost v. Thomas* (1984) 36 Cal.3d 561, 569 (*Yost*).) "While it has been generally said that the reserved power of initiative and referendum . . . is to be liberally construed to uphold it whenever reasonable [citations], it is established beyond dispute that the power of referendum may be invoked only with respect to matters which are *strictly legislative in character*." (*Lincoln Property Co. No. 41, Inc. v. Law* (1975) 45 Cal.App.3d 230, 233–234 (*Lincoln*), italics added.) "This legislative-administrative dichotomy reflects a determination to balance the ideal of direct legislation by the people against the practical necessity of freeing municipal governments from time consuming and costly referenda on

5

merely administrative matters." (*Fishman v. City of Palo Alto* (1978) 86 Cal.App.3d 506, 509 (*Fishman*), fn. omitted.)

Although the test is not precise and the published decisions reflect some inconsistency in approach, "[l]egislative acts generally are those which declare a public purpose and make provisions for the ways and means of its accomplishment. Administrative acts, on the other hand, are those which are necessary to carry out the legislative policies and purposes already declared by the legislative body." (*Fishman, supra,* 86 Cal.App.3d at p. 509.) Alternatively stated, " '[t]he power to be exercised is legislative in its nature *if it prescribes a new policy or plan*; whereas, it is administrative in its nature *if it merely pursues a plan already adopted* by the legislative body itself, or some power superior to it.' " (*Southwest Diversified, Inc. v. City of Brisbane* (1991) 229 Cal.App.3d 1548, 1555, italics added.) "The plausible rationale for this rule espoused in numerous cases is that to allow the referendum or initiative to be invoked to annul or delay the executive or administrative conduct would destroy the efficient administration of the business affairs of a city or municipality." (*Lincoln, supra*, 45 Cal.App.3d at p. 234.)

### B. The City's Contract to Sell Real Estate Is Not a Legislative Act

The issue confronting us is whether Resolution No. 2016-26 constitutes a legislative or an administrative act. Plaintiffs contend Resolution No. 2016-26 is a legislative act because "[t]he resolution decides numerous policy questions for the first time, including the property price and that the contract should be awarded to OTO." Essentially, they argue that a city's adoption of a contract to sell city-owned real property for private development is necessarily a legislative act. Plaintiffs first rely on *Hopping v. Council of City of Richmond* (1915) 170 Cal. 605 (*Hopping*). That case is distinguishable.

In *Hopping,* the issue was whether the city council's decision to accept an offer of land, which would become the site for city hall, was legislative and subject to

6

referendum. A company had offered to donate a block of land and a sum of money to the City of Richmond provided the city would appropriate at least an equal sum of money towards construction of the building and agree that upon completion the building would be occupied and used as the city hall. (*Hopping*, *supra*, 170 Cal. at p. 608.) The city enacted resolutions to accept and facilitate the company's offer. (*Id*. at pp. 608–609.) After the city refused to place a referendum on the ballot to allow the voters to approve or reject these resolutions, the petitioner filed a petition for writ of mandate. (*Id*. at p. 607.)

The Supreme Court concluded the resolutions were done in the exercise of legislative power, citing to the following factors: "They involved and required a determination by the council that the public interest of the city required that it should have a city hall, that the same should be located on the land offered for that purpose, that said offer should be accepted, that a suitable building should be erected thereon, that the money of the city should be appropriated and used in the construction thereof, and that, when completed, the building should be occupied and used by the city officers as a city hall and for municipal purposes, and the declaration by the council that all of these things should be done accordingly. This constituted a declaration of a public purpose and a provision for ways and means of its accomplishment. . . . The council could consider the questions of public good, public interests, and public policy involved solely by virtue of and in the exercise of its legislative powers, and its action thereon was clearly an act in the exercise of that power." (*Hopping, supra*, 170 Cal. at pp. 614–615.)

In the present case, the City is not acquiring land for any municipal purpose, and is not appropriating any of its own funds in connection with the real estate transaction. Instead, the City is selling land to a private developer for a profit, and is not providing any subsidy to the developer. Unlike the situation in *Hopping,* once the property is developed it will not house any municipal buildings or be used to serve any municipal

7

function, but will instead operate as a privately owned hotel. Thus, *Hopping* is not on point.[3]

Plaintiffs also argue that numerous cases have held that a public entity's award of a contract is a legislative act. They rely on *Lindelli, supra,* 111 Cal.App.4th 1099, for the proposition that the City is making a "fundamentally legislative decision" by entering into a contract to sell the property to OTO. Like *Hopping, Lindelli* is also distinguishable from the present case.

In *Lindelli,* the City of San Anselmo had awarded a waste management franchise to a new service provider. After opponents obtained enough signatures to qualify a referendum on the ballot, the city awarded the same franchise a year-long interim contract to cover the period until the referendum election. The appellate court concluded this procedure violated the stay provisions of Elections Code section 9241. (*Lindelli*, *supra*, 111 Cal.App.4th at pp. 1102–1103.) As part of its ruling, it also held that the issuance of the interim contract was akin to the issuance of a franchise, which is a legislative act. The court noted that "[t]he decision, even though for a shorter period, involved the same initial policy decision that qualifies longer grants of franchises as legislative acts: when awarding the contract, San Anselmo decided in the first instance which private entity was best suited *to provide services for the public welfare* for the

---

[3] *Simpson v. Hite* (1950) 36 Cal.2d 125, dealt with resolutions of a board of supervisors designating and acquiring a site for buildings to house municipal and superior courts. The Supreme Court held that state legislation requiring counties to provide buildings to house courts had set the applicable legislative policy, and therefore the act of providing a site and the construction of court buildings thereon was merely an administrative act carrying out that policy and hence the resolutions were not subject to referendum. The court distinguished *Hopping, supra,* 170 Cal. 605 and other similar cases on the ground that "in none of those cases was the court purporting to deal with a situation such as the one at bar, where the legislative policy has been expressly fixed by the state itself, and the execution of that policy has been specifically imposed by the state law on the board of supervisors as an administrative function." (*Simpson v. Hite*, at p. 131.)

8

duration of the contract. Because this decision was legislative, it is subject to the referendum process." (*Id.* at pp. 1113, italics added.)

*Lindelli* is clearly distinguishable because the contract at issue in that case was to provide services to the municipality. Here, OTO will not be providing any services to the City or its residents. Instead, it will be engaging in private business. Thus, even though the transaction in this case necessarily involves a contract, it is not analogous to the contract that was at issue in *Lindelli*.[4]

Plaintiffs also rely on *Reagan v. City of Sausalito* (1962) 210 Cal.App.2d 618 (*Reagan*) for the proposition that decisions regarding real estate are typically found to be legislative in nature. In *Reagan,* the appellate court held that the decision to *acquire* land for a waterfront city park was subject to referendum. (*Reagan*, at p. 624.) Again, here the City is *selling* property, *not* acquiring it. Additionally, the municipality in *Reagan* had argued that the council was exercising an administrative act in purchasing the property because the legislative policy supporting the purchase had already been established. The appellate court dismissed this contention because the only resolutions purporting to establish such policy had been repealed. (*Id.* at pp. 621–624.) In the present case, none of the earlier official acts establishing the policy supporting the contract for the sale of the hotel property have been repealed. Thus, *Reagan* is inapposite.[5]

---

[4] Plaintiffs also cite to *San Diegans for Open Government v. City of San Diego* (2016) 245 Cal.App.4th 736, for the proposition that an award of a contract is a legislative act. While the opinion does state that an entity's award of a contract can be legislative in character, the statement was made in the context of distinguishing legislative acts from adjudicative acts in determining whether ordinary mandamus applied. (*Id.* at pp. 739–740.) The case did not involve the legislative/administrative distinction as it pertains to election jurisprudence.

[5] Plaintiffs also assert that a general law city's decision to sell property is inherently a determination that it is "for the benefit of the city" under Government Code section 37351, and therefore such decisions must be legislative in nature. The referenced section provides, in part: "The legislative body may purchase, lease, exchange, or

9

### C. The PSA Implements Prior Legislative Policy

Plaintiffs argue that the City has not shown that prior legislative policy rendered Resolution No. 2016-26 an administrative act. They assert the City's resolutions amending the Specific Plan for The Crossing development and approving the SEIR set the stage for future enforcement actions and the granting of approvals and permits, not for the execution of a PSA. They concede, however, that enactments or amendments of specific plans are deemed legislative acts. We agree with the City that the adoption of the resolution was an administrative act because it implements prior legislative action.

As noted above in our discussion of *Reagan, supra,* 210 Cal.App.2d 618, if prior acts establish a legislative policy, acts that implement the policy will be deemed administrative. "Once a legislative policy has been established, the administrative acts that follow therefrom are not subject to referendum or initiative. [Citation.] They should not obstruct the project, but should carry it out. [Citation.] An enactment that interferes with the City's ability to carry out its day-to-day business is not a proper subject of voter power." (*City of San Diego v. Dunkl* (2001) 86 Cal.App.4th 384, 400 (*Dunkl*).)

In *Lincoln, supra,* 45 Cal.App.3d 230, the city zoned a tract of land as a "planned community." The city adopted a development plan in accordance with the zoning that prescribed a number of conditions for the detailed plan to be submitted by the developer. The developer then submitted a detailed plan and tentative subdivision map in accordance with the city's development plan. The city resolved to approve the developer's precise plan as presented. Following its approval by the city council, certain members of the community filed a referendum petition. (*Id.* at pp. 232–233.) The court found that the city's development plan constituted a zoning change in which legislative objectives and

---

receive such personal property and real estate situated inside or outside the city limits as is necessary or proper for municipal purposes. It may control, dispose of, and convey such property for the benefit of the city." Plaintiffs' argument is unpersuasive, as there is no reason to assume that administrative decisions cannot also be "for the benefit of the city."

conditions of development were laid down. The developer's plan simply carried out those purposes and conditions. The many facets of the detailed plan had been considered at the time of adoption of the development plan. (*Id.* at pp. 235–236.) The court pointed out that the detailed plan in fact decreased the general size of the buildings approved by the development plan. The city's approval of the plan therefore constituted an administrative act that was not subject to referendum. (*Id.* at p. 236.)

Similarly, in *Fishman, supra,* 86 Cal.App.3d 506, a city council modified a previously approved development plan to permit the construction of a screened enclosure for parked cars. (*Id.* at p. 508.) The court held that the modification did not amount to a rezoning and was an administrative act. The court pointed out that "treating *any* modification of a [zoned] district as a legislative act is inconsistent with the policy behind the legislative-administrative test, which permits the exercise of some judgment based on the costs and benefits of the referendum procedure." (*Id.* at pp. 511–512.)

We agree with the trial court that "[t]he power to sell property which implements prior legislative decisions regarding the development of property is an administrative, not legislative act." Resolution No. 2016-26 pursues an existing legislative plan. Long before the measure's adoption, the City Council took several legislative actions setting forth the manner in which The Crossing hotel site would be developed, including with respect to type of hotel, size, and room count, as well as selecting OTO as the developer after circulating an RFP. The City purchased the site in 2012, after already having decided to reduce the size of the potential hotel to 152 rooms. The City Council certified the SEIR and approved the Specific Plan amendment to conform to the potential hotel project.[6] These actions were legislative actions that set the stage for the PSA. That plaintiffs elected not to challenge these actions does not confer upon them the right to

---

[6] The adoption or amendment of a specific plan is a legislative act. (*Yost, supra,* 36 Cal.3d 561 at p. 570.)

11

referendum now.  (See, e.g., *W.W. Dean & Associates v. City of South San Francisco* (1987) 190 Cal.App.3d 1368, 1379–1380.)

Legislative actions are political in nature, "declar[ing] a public purpose and mak[ing] provisions for the ways and means of its accomplishment." (*Fishman, supra,* 86 Cal.App.3d at p. 509.)  First, there is no real dispute as to the City's longstanding intent to develop the subject property as a hotel.  It appears City residents initially sanctioned the development of The Crossings site by passing a ballot measure in 2001.  Years later, the City duly selected OTO as the developer,[7] with City staff noting that the next steps would be to commence negotiations to set the terms and conditions of an ENRA, after which staff and OTO would negotiate a Disposition and Development Agreement (DDA).  The DDA would "express the terms and conditions of City financial assistance, the process for securing project entitlements and the development conditions for the hotel project."  Under the ENRA, the City reiterated its intent to facilitate the development of a high quality "select-service" hotel.  This included the City's conveyance of the property to OTO.[8]  The City also agreed in the ENRA to prepare and consider amendments to the applicable Specific Plan and related environmental documents to allow for the development of a smaller hotel than the one that had originally been envisioned.

---

[7] Plaintiffs' representatives were present at the meeting in which the City Council selected OTO "to state their hope that the hotel would operate as a union hotel upon completion, regardless of [which developer] was selected."

[8] As stated in a memorandum to the city council dated May 26, 2015, the City had completed the SEIR and was preparing the Specific Plan amendment, which would require introduction and adoption of an ordinance by the city council.  The City would then consider a final DDA by which the City would sell the property to OTO and specify the standards for development of the hotel project.  At that time, it was anticipated that the City would provide approximately $3.9 million in financial assistance to OTO, including conveying the property to OTO for the sum of $1 only.

12

Plaintiffs emphasized below that the City had never indicated that it would be approving the project under a PSA rather than a DDA. Throughout these proceedings plaintiffs have asserted that the Specific Plan "has never detailed who would develop the hotel," or "who the City should sell the property to and for how much," asserting that Resolution No. 2016-26 itself establishes the primary legislative policy underlying the PSA. We disagree. While the City ultimately chose to proceed under a PSA, the end result is consistent with its prior legislative decisions. The PSA mirrors the development criteria discussed in the Specific Plan. For example, under the PSA, OTO will develop a 152-room hotel that will provide limited food and beverage service, and include approximately 3,000 square feet of meeting space and at least 163 parking spaces.

Plaintiffs further assert that the City has failed "to identify the specific legislative action that established the ways and means that Resolution No. 2016-26 is supposedly implementing." We again disagree. In addition to the overall history of actions leading to the selection of OTO as the developer, the September 8, 2015 approval of resolutions certifying the SEIR and the Specific Plan amendment set the stage for Resolution No. 2016-26. For example, Resolution No. 2015-82 amended the Specific Plan "to allow a hotel of up to 152 rooms providing limited food service facilities, conference/banquet space to accommodate up to 300 people." It follows that by entering into the PSA, the City used its administrative powers to effectuate existing legislative policy.

Plaintiffs have not referred us to any authority for the proposition that a municipal contract to sell public land for private development constitutes a legislative act when the primary substantive decisions pertaining to the proposed development have already been made. We note Resolution No. 2016-26 itself does not include any new action to further amend the Specific Plan, adopt new legislation, or otherwise take legislative action.[9] Its

---

[9] Plaintiffs have abandoned their argument below that the adoption of the resolution approving the PSA was effectively the adoption of an ordinance approving a

13

essential purpose is to transfer the property to OTO in order to further already existing legislative policies put in place for the development of The Crossing hotel site. Accordingly, we conclude that the trial court properly declined to invalidate Bonner's refusal to process plaintiffs' referendum petition.  In light of our conclusions, we need not address the parties' remaining arguments.

## DISPOSITION

The order and judgment are affirmed.

---

development agreement.  Development agreements are legislative acts that are subject to referendum.  (Gov. Code, § 65867.5.)

_____
Dondero, J.

We concur:


_____
Margulies, Acting P. J.


_____
Banke, J.


A149409  *San Bruno Committee for Economic Justice et al. v. San Bruno et al.*

15

Trial Court:          San Mateo County Superior Court

Trial Judge:          Hon. George A. Miram

Counsel:

Leonard Carder, LLP, Arthur Liou, for Plaintiffs and Appellants San Bruno Committee for Economic Justice et al.

City Attorney of City of San Bruno, Mark L. Zafferano, Burke, Williams & Sorensen, LLP, Kevin D. Siegel, Christopher M. Long, for Defendants and Respondents City of San Bruno, et al.

Allen Matkins Leck Gamble Mallory & Natsis LLP, David H. Blackwell, for Real Parties in Interest San Bruno Hotels, LLC, et al.

A149409  *San Bruno Committee for Economic Justice et al. v. San Bruno et al.*